Timothy Sandefur (224436)
Adam Shelton (Admitted Pro Hac Vice)
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Michael K. Friedland (157217)
**FRIEDLAND CIANFRANI LLP**
17901 Von Karman Ave., Ste. 925
Irvine, California 92614
(949) 734-4900
Michael.friedland@fciplaw.com

*Attorneys for Plaintiffs*

**IN THE U.S. DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

FLYING GOAT CELLARS, INC., a California general corporation; NORM YOST, an individual; and KATHLEEN GRIFFITH, an individual,

Plaintiffs,

vs.

SANTA BARBARA COUNTY BOARD OF SUPERVISORS, a government entity; BOB NELSON, in his official capacity as Chairman of the Board of the Santa Barbara Board of Supervisors; SANTA BARBARA COUNTY VINTNERS ASSOCIATION, a business league;

Defendants.

Case No. 2:26-cv-05489-SPG-DMK

**PLAINTIFFS' JOINT OPPOSITION TO THE SEPARATE MOTIONS TO DISMISS FILED BY DEFENDANTS SANTA BARBARA COUNTY BOARD OF SUPERVISORS, BOB NELSON, AND SANTA BARBARA COUNTY VINTNERS ASSOCIATION**

## TABLE OF CONTENTS


TABLE OF CONTENTS ..... 2

TABLE OF AUTHORITIES ..... 3

I. Introduction ..... 5

II. Statement of Facts ..... 6

III. Standard of Review ..... 8

IV. Argument ..... 9

A. The one percent assessment on the gross sales revenue of Flying Goat Cellars' California-based sales is a *per se* taking of Plaintiffs' private property under the Fifth Amendment. ..... 9

B. There is no sufficient "public use" to justify this taking. ..... 13

C. The Dismissal of Chairman Nelson. ..... 16

V. Conclusion ..... 16

# TABLE OF AUTHORITIES

## Cases

*99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp.2d 1123 (C.D. Cal. 2001) .......... 14, 15, 16

*Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) .......... 14, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 8

*Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022) .......... 10, 12, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 8

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) .......... 10, 11

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .......... 9

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897) .......... 9

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp.2d 1203 (C.D. Cal. 2002) .......... 16

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) .......... 4

*Fowler v. Guerin*, 899 F.3d 1112 (9th Cir. 2018) .......... 11

*Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984) .......... 13, 14, 15, 16

*Horne v. Dep't of Agric.*, 576 U.S. 351 (2015) .......... 10

*Kelo v. City of New London*, 545 U.S. 469 (2005) .......... 13, 14, 15, 16

*Knappenberger v. City of Phoenix*, 566 F.3d 936 (9th Cir. 2009) .......... 9

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) .......... 8

*Schneider v. California Dep't of Corr.*, 345 F.3d 716 (9th Cir. 2003) .......... 11

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) .......... 10, 11

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .......... 13

*Zeyen v. Bonneville Joint Dist., # 93*, 114 F.4th 1129 (9th Cir. 2024) .......... 10

## Constitutional Provisions

U.S. Const., amend. V .......... 9

## Statutes

Cal. Sts. & High. Code § 36621(a) .......... 6

Cal. Sts. & High. Code §§ 36600–36671 .......... 6

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........ 8
Federal Rule of Civil Procedure 8(a)(2) ........ 8

## I. Introduction

Flying Goat Cellars is an urban winery located in Lompoc, California. Flying Goat does not grow grapes, but instead buys them from other vineyards and then engages in the winemaking process. Flying Goat and its owners have worked hard over the years to establish a brand and a following, and have spent money on marketing that makes sense for their particular business model, structure, and the wines they produce.

Now, however, they have been forced by the Santa Barbara County Board of Supervisors to hand over one percent of their gross sales revenue to a private party—the Santa Barbara County Vintners Association ("SBCVA"). This private trade association—which long preexisted Santa Barbara County's establishment of the Santa Barbara County Wine Improvement District ("SBCWID")—is supposed to spend the money that private wineries are forced to hand over to promote Santa Barbara County as a wine destination, increase visitation and wine sales, and strengthen the recognition of the region's wine industry.

But there is nothing in the agreement between the SBCVA and the County, nor in the law itself, that requires the SBCVA to obtain approval from the County for any actions it takes with money taken from Flying Goat and other wineries. There is no requirement for coordination between the SBCVA and other similar entities, or even the County itself, to ensure that there is no conflicting messaging, or any requirement that the SBCWID even be beneficial to the County or other industries in the County. In fact, by law, the SBCWID is only required to benefit the assessed businesses—private wineries.

In sum, the Santa Barbara Board of Supervisors enacted the SBCWID, and requires all wineries, including Flying Goat, to turn over one percent of their gross revenue to a preexisting private trade association, which gets the direct benefit of an immediate influx of capital that it can use to benefit privately owned wineries in California. Further, the SBCVA makes these decisions without any immediate

oversight from the Board of Supervisors. This is the exact type of government-forced transfer of private property from one party to another that the Takings Clause of the Fifth Amendment to the U.S. Constitution is designed to thwart.

## II. Statement of Facts

Plaintiffs Norm Yost and Kathleen Griffith are the co-owners of Plaintiff Flying Goat Cellars, a family-owned urban winery in Lompoc, California. Compl. [Doc. 1] ¶¶ 2; 8-10. Since 2000, Plaintiffs have operated their winery in Lompoc, making it into one of the most celebrated wine producers in Santa Barbara County. *Id.* at ¶ 2. In developing their brand, Plaintiffs have deliberately focused on marketing directly to local customers in the County, rather than directing their limited marketing budget to attracting interest from large distributors or international markets. *Id.* at ¶ 51.

The SBCVA is a private trade association founded in 1983 as a voluntary association for wineries in the County. *Id.* at ¶¶ 23-24. In 2020, having failed to achieve its goals through voluntary membership, the SBCVA's leadership decided to lobby the County Board of Supervisors to compel all wineries in the County to become members of the SBCVA and forfeit one percent of their gross sales revenue of California-based sales to the SBCVA. *Id.* at ¶¶ 27, 28. That attempt failed. *Id.* Undeterred, SBCVA restarted the process of establishing a wine improvement district in 2024. *Id.* at ¶ 29.

Under the California Property and Business Improvement District Law of 1994 (Cal. Sts. & High. Code §§ 36600–36671) ("PBID Law"), a Business Improvement District (BID) can only be created by a petition from business owners who will pay more than half of the proposed assessment. *Id.* § 36621(a). In other words, the first step in establishing a BID is a weighted vote by which larger businesses have more of a say in establishing the BID. Here, this structure gave large, high-revenue wineries effectively more votes, leaving small wineries like Flying Goat without a meaningful say in the creation of the BID. Compl. ¶ 30.

The SBCVA presented the Board of Supervisors with 126 petitions in favor of the creation of the SBCWID. *Id.* at ¶ 31. This vote represented a 59.69% weighted vote in favor of the creation of the SBCWID, meaning wineries that represent 40% of the assessment, including Flying Goat, did not vote in favor of the resolution. *Id.*, Ex. 2.

The Board of Supervisors in February 2025 adopted a Resolution creating the SBCWID. *Id.* at ¶ 32, Ex. 3. The Board then contracted with the SBCVA, the entity that lobbied for the creation of the SBCWID, to be the owner's association for the SBCWID in accordance with the PBID Law. *Id.* at ¶ 33. Along with the Resolution and the contractual agreement with the SBCVA, the Board of Supervisors also adopted the five-year management plan for the SBCWID drafted by the SBCVA. *Id.* at ¶ 35. Under that Resolution, all wineries in the County are required to transfer one percent of their gross sales revenue to the owners' association, the SBCVA. *Id.* ¶ 36. The SBCVA is permitted to spend the money transferred from the wineries in accordance with the management plan, and there are only limited situations in which the County has any say over how the funds are spent—including for a tort claim or litigation related to the SBCWID. *Id.* at ¶ 39.

Plaintiffs have transferred one percent of their gross sales revenue on purchases made in California to the SBCVA in July 2025, October 2025, January 2026, and April 2026. *Id.* at ¶ 45. Plaintiffs have caused the transfer of their gross sales revenue to the SBCVA not because they see any benefit in funding a private association that benefits other private entities, but because they are required to by law. *Id.* at ¶¶ 45, 48. They will continue to be required to transfer one percent of their gross sales revenue to the SBCVA quarterly, unless enjoined by this Court.

Flying Goat made its objection to the SBCWID known through a February 2026 letter to the Board and SBCVA, highlighting the constitutional inadequacies of the SBCWID and requesting an option to opt out of the SBCWID and the required

transfer of a part of their gross revenue to the SBCVA. *Id.* at ¶ 52, Ex. 8. Both the Board and the SBCVA ignored Plaintiffs' request. *Id.* at ¶ 54.

As a result, Plaintiffs filed suit against the Board and the SBCVA in May 2026, alleging that the SBCWID violated their First Amendment rights by compelling them to join a private association, infringing their freedom of association, and requiring Plaintiffs to subsidize the speech of SBCVA, a private trade association. *Id.* at ¶¶ 56-57. Plaintiffs also raised a Fifth Amendment Takings claim, asserting that the taking of one percent of their gross revenue is not for a public use, but instead a naked transfer of private property from Plaintiffs to a private party, the SBCVA, for the purpose of directly benefiting other private parties, i.e., other wineries in the County. *Id.* at ¶¶ 60-63.

Defendants have now moved to dismiss Plaintiffs' third claim—the claim alleging that the SBCWID and the associated one percent "assessment" violates the Fifth Amendment's Takings Clause.

## III. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this requirement can be dismissed pursuant to Rule 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court must take the well-pleaded allegations as true and construe them in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff overcomes a motion to dismiss by alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A 12(b)(6) motion tests only "the legal sufficiency of a claim" not the ultimate merits. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Thus "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Further, even if a court determines that dismissal is appropriate, it should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## IV. Argument

Plaintiffs have pleaded sufficient facts to plausibly allege that the one percent of gross sales revenue they are required to hand over to the SBCVA under the guise of an "assessment" is in fact a taking of Plaintiffs' property without the constitutionally required public use.

### A. The one percent assessment on the gross sales revenue of Flying Goat Cellars' California-based sales is a *per se* taking of Plaintiffs' private property under the Fifth Amendment.

Plaintiffs challenge Defendant Board of Supervisors' Resolution creating the SBCWID, which requires them to transfer one percent of the gross sales revenue of California-based sales to a private trade association in the form of a quarterly assessment. Plaintiffs allege this constitutes a taking without a sufficient public use.

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const., amend. V; *see also* *Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 238–39 (1897) (incorporating the Takings Clause through the Fourteenth Amendment). "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). A "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation" (or statute, or ordinance, or miscellaneous decree). *Id.* Rather, the essential question when determining whether there has been a *per se* taking "is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a

property owner's ability to use his own property." *Id.* And "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Id.*

The Supreme Court has held that personal property falls within the meaning of "property" as used in the Takings Clause. *See Horne v. Dep't of Agric.*, 576 U.S. 351, 357 (2015). Money is also included within that definition. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160-65 (1980) (holding that there was a taking where a court appropriated interest earned on the principal in an interpleader account); *see also Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 (2003) (holding that a law requiring the placement of funds into an interest-bearing account and requiring that the interest on those funds be transferred to a different owner for a legitimate public use, however, could be a *per se* taking requiring the payment of 'just compensation' to the client.").

In the Ninth Circuit, the determination of whether a monetary taking has occurred turns on whether a governmental entity appropriates a specific sum of money from an identifiable fund, or merely imposes a general monetary liability triggered by a future event or choice. *See Ballinger v. City of Oakland*, 24 F.4th 1287, 1294 (9th Cir. 2022); *see also Zeyen v. Bonneville Joint Dist., # 93*, 114 F.4th 1129 (9th Cir. 2024).

Here, Plaintiffs have pleaded sufficient facts to show that the Board of Supervisors, in enacting Resolution Number 25-18, appropriated a specific sum of money from an identifiable fund. Plaintiffs are forced to pay a one percent assessment—a specific sum of money, rather than an ever-changing amount based on individual circumstances. Compl. ¶ 65. This money is to be paid from an identified fund: the gross sales revenue from a winery's California-based sales. *Id.* ¶ 36. This fund is separate from the gross sales revenue from sales made outside of California, which are not to be included in the computation of the "assessment." *Id.* ¶ 36. The fact that the assessment is owed on/from the gross sales revenue from California-based sales but not for sales outside of California necessarily requires the wineries

and their owners, like Plaintiff, to have two separate gross revenue "funds" to ensure compliance with Resolution 25-18.

These facts, as alleged, make this situation analogous to *Webb's* and *Brown,* two cases in which the Supreme Court held that a governmental entity's taking of interest from money in an interest-bearing account was a taking. *See Webb's*, 449 U.S. at 165 (holding that there was a taking where a court appropriated interest earned on the principal in an interpleader account); *Brown*, 538 U.S. at 240 (holding that a law requiring the placement of funds into an interest-bearing account and requiring 'that the interest on those funds be transferred to a different owner … could be a *per se* taking requiring the payment of 'just compensation' to the client."). The Ninth Circuit has followed this holding in determining that the government's appropriation of interest from an interest-bearing account that an individual has placed money in qualifies as a *per se* taking. *See Fowler v. Guerin*, 899 F.3d 1112, 1117–18 (9th Cir. 2018) (finding a taking when the Director of the Washington State Department of Retirement Systems took interest earned from money placed by public school teachers into state managed retirement account); *Schneider v. California Dep't of Corr.*, 345 F.3d 716, 720 (9th Cir. 2003) (holding that the California Department of Corrections engaged in a *per se* taking when it appropriated interest earned through the money deposited by an inmate into inmate trust accounts).

In each of those four cases, there was an identifiable fund (the interest earned by interest-bearing accounts) and a specific sum of money (all the interest), and each case was based on a contingency (the placing of money in an interest-bearing account). The same is true here. There is a fund (the gross sales revenue from California-based sales), a specific sum of money (one percent of the fund), and the taking is based on a contingency (the sale of wine). If the taking of "all interest"—even if there is none—qualifies as a specific sum of money for takings purposes, but the taking of one percent of the gross sales revenue does not, then the specific sum requirement from the above-cited cases would be rendered effectively meaningless.

In short, not finding a taking here then would conflict directly with Ninth Circuit and Supreme Court case law.

Defendants, relying principally on the Ninth Circuit's decision in *Ballinger*, 24 F.4th 1287, assert that this is not a taking at all, but a mere obligation to pay money based upon a contingency.[1] *Ballinger* involved an ordinance that required "landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment based on rental size, average moving costs, the duration of the tenants' occupancy, and whether the tenants earn a low income, are elderly or disabled, or have minor children." *Id.* at 1291. Defendants' reliance on that case is misplaced for three reasons: (1) the payments in *Ballinger* were not standard, but fluctuated based on the individual circumstances of each situation; (2) the payments were made directly to the tenant being evicted, in response to a perceived harm caused by the landlord against the tenant, thereby evidencing a relationship to the larger landlord-tenant regulatory scheme; and (3) the ordinance identified no specific pool of money from which the payments were to be made.

In *Ballinger*, there was no specific sum of money that was being "taken," whereas here, there is.

Nothing in the Ordinance involved in *Ballinger* required the relocation fee to come from an identifiable fund or source of revenue (like, say, a percentage of the rental income). Here, by contrast, the assessment is based specifically on an identifiable source of revenue: California-based sales. Compl. ¶ 36; Ex. 3 at 3 ¶ 8. Under the Resolution, sales outside of California do not count (with the consequence that wineries and their owners, like Plaintiffs, must self-segregate their gross revenue into different streams). *Id.*

---

[1] Defendant Santa Barbara County Vintners Association's Motion to Dismiss Takings Claim [Doc. 24] ("SBCVA Mot."), at 12-13; Defendant Santa Barbara County Board of Supervisors' Motion to Dismiss [Doc. 26-1] ("Board Mot."), at 2-6.

Finally, the relocation fee in *Ballinger* was paid by the landlord to the former tenant, leading the court to conclude that the fee was not a taking but simply an exercise of the state's power to regulate the landlord-tenant relationship. *Id.* at 1293. The Ninth Circuit therefore likened the relocation fee to a rent control ordinance, and concluded that it "merely regulate[s] [the Ballingers'] use of their land by regulating the relationship between landlord and tenant." *Id.* (quoting *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992)). Here, however, the assessment has no relationship to California or Santa Barbara's greater regulatory authority over wineries. The money goes directly to the SBCVA, a private trade association that has no regulatory role. Compl. ¶ 81. Further, the SBCWID has no regulatory component, and the assessment funds no regulatory programs. *Id.* The assessment then is *not* a part of a larger regulatory scheme, but is simply forced funding for a private trade association.

**B. There is no sufficient "public use" to justify this taking.**

In addition to alleging a taking, Plaintiffs allege that there is no sufficient "public use" to justify that taking. In support of this assertion, Plaintiffs allege that the assessment goes directly to the SBCVA with the Board only having limited ability to divert any of the funds from the SBCVA. Compl. ¶ 39. Further, Plaintiffs allege that the statute authorizing the creation of business improvement districts like the SBCWID expressly requires these entities to serve "local" and private business interests, not the public at large. *Id.* ¶¶ 63, 104. Defendants do not dispute the direct benefit to private businesses, or the fact that the assessment is controlled by a preexisting private trade association. SBCVA Mot. at 14-15; Board Mot. at 6-7. Instead, they argue that the taking satisfies the public use requirement because it purportedly helps create jobs and improve the local economy. They largely rely on *Kelo v. City of New London*, 545 U.S. 469 (2005) and *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984).

But those cases do not support Defendants' argument. In fact, both cases made clear that the Takings Clause prohibits a taking that confers a private benefit on a

private party. *Kelo*, 545 U.S. at 477 ("the sovereign may not take the property of A for the sole purpose of transferring it to another private party B."); *Midkiff*, 467 U.S. at 245 ("A purely private taking could not withstand the scrutiny of the public use requirement."). The takings in those cases were upheld because they served comprehensive development plans that sought to remedy some significant problem within their respective communities—blight, economic distress, housing shortages, etc.—and therefore fell within the police power. The property was taken there "not to benefit a particular class of identifiable individuals but to attack certain perceived evils," and were therefore "classic exercise of a State's police powers." *Id.* at 242, 245.

The same cannot be said here. There is no contention that the SBCWID is part of any larger comprehensive redevelopment plan aimed at addressing blight, oligopoly, or any other harm in the community. On the contrary, Plaintiffs have alleged facts showing that the assessment is a transfer of their private property to another private party, the SBCVA, for the benefit of the SBCVA and the wine industry, a particular class of private parties.

However broad the definition of "public use" may be, courts are not required to rubber-stamp the government's assertion of a "public use." *Cf. Armendariz v. Penman*, 75 F.3d 1311, 1321 (9th Cir. 1996) (rubber-stamping mere assertions of public use would cause "the Takings Clause [to] lose all power to restrain government takings.") Courts must instead look behind an asserted public use to ensure that it is not pretextual. *Kelo*, 545 U.S. at 478 ("[n]or would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit."); *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F. Supp.2d 1123, 1129 (C.D. Cal. 2001) ("No judicial deference is required, for instance, where the ostensible public use is demonstrably pretextual.").

*Kelo* involved a "carefully considered" comprehensive development plan, intended to remedy the economic circumstances of a city designated as a distressed municipality. 545 U.S. at 473. *Midkiff* concerned a statute whereby fee title was taken from lessors and transferred to lessees (for just compensation) in order to reduce the concentration of land ownership, which was described as a "social and economic evil[]." 467 U.S. at 241-42.

Here, by contrast, the County made a one-off decision to require wineries to fund a trade association—a private, non-governmental entity—that exists to encourage tourism and purchases of wine. The SBCVA is not required to coordinate with, or even to consult with, the Board of Supervisors. It does not regulate or operate as an enforcement entity; it is simply an organization that exists for the purpose of promoting wineries.

In *Kelo*, the Court addressed a hypothetical situation where a city transfers citizen A's property to citizen B "for the sole reason that citizen B will put the property to a more productive use and thus pay more taxes," and called that situation—especially if "outside the confines of an integrated development plan"—something that would "raise a suspicion that a private purpose was afoot." 545 U.S. at 486-87. In so doing, the Court cited approvingly *99 Cents, supra*–another case that is instructive here.

In *99 Cents*, the Plaintiffs challenged Lancaster's condemnation of their property, which was undertaken in order to give the land to another private party, Costco, in order to improve the local economy. 237 F. Supp.2d at 1129. Lancaster argued that the taking was necessary because Costco was an "anchor tenant" in an important development and had threatened to leave had Lancaster not condemned the property. *Id.* at 1126. If Costco left, the city said, "surrounding businesses would potentially suffer and eventually cause a 'reestablishment of blight.'" *Id.* at 1129. The court found this inadequate under the public use requirement. The court noted that the city "[did] not contend—nor did it ever find—that 99 Cents' property suffers

from any *existing* blight." *Id.*. Instead, the city sought to take the property "'just because the public agency considers that it can make a better use or planning of an area,'" *id.* at 1130 (citation omitted)—that is, simply to promote generalized economic improvement. That, the court concluded, was not a public use. *Id.* at 1131; *accord, Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp.2d 1203, 1229-30 (C.D. Cal. 2002).

Defendants' arguments here parallel those rejected in *99 Cents*. They argue that taking the money from wineries and their owners, and giving it to a private trade association, the SBCVA, will indirectly promote economic development by enabling the association to promote Santa Barbara as a place to visit and buy wine. SBCVA Mot. at 14-15. This is nothing more than a bare assertion absent any evidence. Under Defendants' theory, it is hard to see how the prohibition on private takings emphasized in both *Kelo* and *Midkiff* could retain any force; instead, that prohibition "would lose all power to restrain government takings." *Armendariz*, 75 F.3d at 1321.

Plaintiffs have alleged sufficient facts at this stage to lead to a reasonable inference that the taking is primarily for a private benefit and not a public use. Thus, this Court should deny Defendants' Motions to Dismiss and permit Plaintiffs' claim to proceed to discovery.

### C. The Dismissal of Chairman Nelson.

The Board of Supervisors also moves to dismiss Chairman Nelson, who was sued only in his official capacity. Board Mot. at 7-8. Plaintiffs do not oppose this request.

## V. Conclusion

For the reasons set forth above, the Court should deny Defendants' motions to dismiss.

**RESPECTFULLY SUBMITTED** this 30th day of September 2026.

GOLDWATER INSTITUTE

/s/ *Adam Shelton*
Timothy Sandefur (224436)
Adam Shelton (Admitted Pro Hac Vice)
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, Arizona 85004

/s/ *Michael K. Friedland*
Michael K. Friedland (157217)
**FRIEDLAND CIANFRANI LLP**
17901 Von Karman Ave., Ste. 925
Irvine, California 92614
(949) 734-4900
Michael.friedland@fciplaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

ORIGINAL E-FILED this 30th day of September, 2026, with a copy delivered via the ECF system to:

Sara Brucker
Deputy County Counsel
County of Santa Barbara
105 E. Anapamu St., Ste. 201
Santa Barbara, CA 93101
sbrucker@countyofsb.org
*Attorneys for Defendants*
*Santa Barbar County Board of Supervisors*
*and Bob Nelson*

Matthew C. Slentz
Michael Colantuono
COLANTUONO, HIGHSMITH & WHATLEY, PC
7545 Irvine Center Drive, Suite 200
Irvine, California 92618
mslentz@chwlaw.us
mcolantuono@chwlaw.us
*Attorneys for Defendant*
*Santa Barbara County Vintners Ass'n*

/s/ *Kris Schlott*
Kris Schlott, Paralegal